**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | |
|---|---|
| **FEDERICO TORRES, Individually and as representative and ANF of R.T., Deceased Minor; ARNULFO REYES; PATRICIA ALBARADO; MONICA ARRIOLA, Individually and ANF of J.T., Minor; ERICA BARRERA, Individually and ANF of D.R., Minor; MICHAEL BROWN, Individually and ANF of V.B.; JENNIFER DAVIS, Individually and ANF of Z.D., Minor; JENNIFER GAITAN, Individually, And ANF of J.N., Minor; ANGELI ROSE GOMEZ, Individually and ANF G.B. & A.G., Minors; LUZ HERNANDEZ, Individually and ANF of N.J., Minor; CARLA ROSE KING; TIFFANY LUNA, Individually and ANF of A.P., Minor; TAMICA MARTINEZ, Individually and ANF of R.D., Minor; TIFFANY MASSEY; YOLANDA MORALES, Individually and as ANF of Z.G., Minor; MARK MORENO and ROSEMARY MORENO, Individually and ANF of N.M., Minor; NICOLE FAYE OGBURN; MARY ANN REYES, Individually and ANF of A.S. & A.S., Minors; BIANCA RIVERA, Individually, AND ANF of G.R., Minor; SAMANTHA RODRIGUEZ, Individually and ANF of M.J., Minor; JULIO/PRISCILLA RUBIO, Individually and ANF of M.R., Minor; BRIANA RUIZ, Individually and ANF D.G., Minor; CHRISTIAN and BRENDA SONORA, Individually and ANF V.S.; DAVID TREVINO, Individually and as ANF of A.T., I.T. & D.T., Minors; KRYSTAL UPTON, Individually and ANF of J.T. and B.T., Minors; ESMERALDA VELASQUEZ, Individually and ANF of C.V., Minor; SOFIA ZAPATA, Individually and ANF of M.S., Minor; and JANE DOE, Individually** | **Case No.**   2:23-cv-32 <br><br> **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** <br><br> 1) Negligent Marketing/ Distribution <br> 2) Negligence <br> 3) Negligent Entrustment <br> 4) Negligent Hiring, Training, and supervision <br> 5) Negligent Sale <br> 6) Agency <br> 7) Gross Negligence <br> 8) Product Liability- Manufacturing Defect <br> 9) Product Liability- Marketing Defect <br> 10) Texas Deceptive Trade Practices Act |

*Plaintiffs,*

**V.**

**DANIEL DEFENSE, LLC, a limited
Liability Company; OASIS OUTBACK,
LLC, a Texas limited Liability Company;
FIREQUEST INTERNATIONAL, INC.,
an Arkansas Corporation,**

    *Defendants.*

---

## PLAINTIFFS' ORIGINAL COMPLAINT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, FEDERICO TORRES, Individually and as Representative and ANF of R.T., Deceased Minor; Et. al., hereinafter referred to by name or as Plaintiffs, and files their Original Complaint against the CITY OF UVALDE, Et. al. hereinafter referred to by name or as Defendants.

## I.
## <u>INTRODUCTION</u>

1.1    On May 24, 2022, Uvalde, Texas had one of the worst school massacres in Texas history at Robb Elementary School in Uvalde, Texas. Nineteen (19) children and two (2) teachers were killed, and countless others were injured and traumatized while school officials and hundreds of law enforcement personnel stood by, failing to act. Salvador Ramos, an 18-year-old Uvalde man, hereinafter referred to as "Shooter", with a history of mental disturbance, instability, and domestic issues illegally purchased semi-automatic weapons, ammunition, high-capacity magazines, and a Hell-Fire trigger system to use in the massacre. The shooter bought and assembled a military grade assault weapon with 30-round magazines days before his 18th birthday,

2

and entered the Robb Elementary School unabated, wearing tactical gear, and carried out the deadliest school shooting in Texas history.

## II.
## PARTIES

2.1     Plaintiff **Patricia Albarado** is an Individual who resides in Uvalde, Texas.

2.2     Plaintiff **Monica Arriola,** Individually and ANF of J.T., Minor, both of whom reside in Uvalde, Texas.

2.3     Plaintiff **Erica Barrera,** Individually and ANF of D.R., Minor, both of whom reside in Uvalde, Texas.

2.4     Plaintiff **Michael Brown,** Individually and ANF of V.B., Minor, both of whom reside in Uvalde, Texas.

2.5     Plaintiff **Jennifer Davis**, Individually and ANF of Z.D., Minor, both of whom reside in Uvalde, Texas.

2.6     Plaintiff **Jennifer Gaitan,** Individually and ANF of J.N., Minor, both of whom reside in Uvalde, Texas

2.7     Plaintiff **Angeli-Rose Gomez**, Individually and ANF of G. B & A.G., Minors, all of whom reside in Uvalde, Texas.

2.8     Plaintiff **Luz Hernandez**, Individually and ANF of N.J., Minor, both of whom reside in Uvalde, Texas.

2.9     Plaintiff **Carla Rose King** is an Individual who resides in Uvalde, Texas.

2.10    Plaintiff **Tiffany Luna,** Individually and ANF of A.P., Minor, both of whom reside in Uvalde, Texas

2.11    Plaintiff **Tamica Martinez,** Individually and ANF of R.D., Minor, both of whom reside in Uvalde, Texas

2.12    Plaintiff **Tiffany Massey**, is an Individual who resides in Uvalde, Texas

2.13    Plaintiff **Yolanda Morales** Individually and ANF of Z.G., Minor, both of whom reside in Uvalde, Texas

2.14    Plaintiffs **Mark Moreno and Rosemary Moreno** Individually and ANF of Z.G., Minor, both of whom reside in Uvalde, Texas

2.15     Plaintiff **Nicole Faye Ogburn** is an Individual who resides in Uvalde, Texas.

2.16     Plaintiff **Arnulfo Reyes** is an Individual who resides in Uvalde, Texas.

2.17     Plaintiff **Maryanne Reyes,** Individually and ANF of A.S and A.S, Minors, all of whom reside in Uvalde, Texas

2.18     Plaintiff **Bianca Rivera**, Individually and ANF of G.R., Minor, both of whom reside in Uvalde, Texas.

2.19     Plaintiff **Samantha Rodriguez,** Individually and ANF of J.M., Minor, both of whom reside in Uvalde, Texas.

2.20     Plaintiffs **Julio and Priscilla Rubio**, Individually and ANF of M.R., Minor, both of whom reside in Uvalde, Texas.

2.21     Plaintiff **Briana Ruiz**, Individually and ANF of D. G., Minor, both of whom reside in Uvalde, Texas.

2.22     Plaintiffs **Christian and Brenda Sonora,** Individually and ANF V.S.; Minor, all of whom reside in Uvalde, Texas

2.23     Plaintiff **Federico Torres,** Individually and ANF of R.G., Deceased Minor, who resides in Uvalde, Texas.

2.24     Plaintiff **David Trevino**, Individually and ANF of A.T., I.T. & D.T., Minors, all of whom reside in Uvalde, Texas.

2.25     Plaintiff **Krystal Upton,** Individually and ANF of J.T. and B.T., Minors, all of whom reside in Uvalde, Texas.

2.26     Plaintiff **Esmeralda Velasquez**, Individually and ANF of C.V., Minor, both of whom reside in Uvalde, Texas.

2.27     Plaintiff **Sofia Zapata**, Individually and ANF of M.S., Minor, both of whom reside in Uvalde, Texas.

2.28     Plaintiff, **Jane Doe**, individually.

2.29     Defendant **City of Uvalde** is a municipality organized under the laws of the State of Texas. The Uvalde Police Department ("UPD") is an agency of the City of Uvalde. At all relevant times, the City of Uvalde was charged by law with the administration and operation of the UPD, including employment, control, supervision, discipline, training and practices of the

UPD's personnel and employees, and with the formulation of its policies, practices and customs. In addition, the City of Uvalde is responsible for ensuring that the personnel of UPD obeyed the laws of the United States and of the State of Texas. The City of Uvalde is legally responsible for the acts and omissions of the UPD. The City of Uvalde may be served with process through Mayor Don McLaughlin at 101 E. Main Street, Uvalde, Texas 78801.

2.30    Defendant **Uvalde County** is a county organized under the laws of the State of Texas. The Uvalde County Sheriff's Office ("UCSO") is an agency of Uvalde County. The Uvalde County Constables are an agency of Uvalde County. At all relevant times, Uvalde County was charged by law with the administration and operation of the UCSO and Constables, including employment, control, supervision, discipline, training and practices of the UCSO's personnel and employees, and Constables, and with the formulation of its policies, practices and customs. Uvalde County is legally responsible for the acts and omissions of the UCSO and Constables. In addition, Uvalde County is responsible for ensuring that the personnel of UCSO and Constables obeyed the laws of the United States and of the State of Texas. Uvalde County may be served with process through the County Judge, The Honorable William R. Mitchell, at 100 N. Getty Street, Uvalde, Texas 78801.

2.32    Defendant, **Uvalde Consolidated Independent School District (the "School District")** is a public school district in Uvalde, Texas. Robb Elementary is within the School District. The School District was, at all relevant times, responsible for the care, safety, management, and security of all students, teachers, staff, campuses, and public-school business within its jurisdiction, including Robb Elementary. The School District acted or failed to act, at all relevant times, through its employees, agents, and/or chief policymakers, and is liable for such actions and/or failure to act. The Uvalde Consolidated Independent School District Police Department ("UCISD PD") is an agency of the School District. The School District is charged by law with the administration and operation of UCISD PD, including the employment, control, supervision, discipline, training, and practices of UCISD PD's personnel and employees, and with the formulation of its policies, practices, and customs. The School District is legally responsible for the acts and omissions of UCISD PD. The School District and UCISD PD's policies, practices, and/or customs were moving forces in causing the Plaintiffs resulting damages. The School District may be served with process through its Superintendent Gary Patterson, at 1000 N. Getty Street, Uvalde, Texas 78801.

2.33    Defendant **Mandy Gutierrez** is an individual residing in Uvalde, Texas. At all relevant times, Mandy Gutierrez (or "Principal Gutierrez") was the Principal at Robb Elementary School. Principal Gutierrez was an official policymaker for the School District and the official policymaker for Robb Elementary School. Principal Gutierrez acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. Principal Gutierrez is sued in both her individual and official capacities and can be served with process at 1000 N. Getty Street, Uvalde, Texas 78801.

2.34    Robb Elementary was not adequately prepared for the risk of an active shooter on campus. For example, the school's five-foot tall exterior fence was inadequate to impede an intruder; there was a culture of noncompliance with the security policies to lock exterior and internal classroom doors; the school did not treat the maintenance of doors and locks with any

urgency; there was poor internet and cellular phone service throughout the building, which impeded the use of warning or alarm systems; and the school's lockdown alert system was overused to alert parents to "bailouts," a term used to describe police car chases involving human smugglers, which sometimes end in crashes and shootouts, so that when there was a more immediate emergency on May 24, 2022, parents and staff were desensitized to the alert.

2.35    Defendant **Pedro "Pete" Arredondo** ("Arredondo") is an individual residing in Texas. At all relevant times, Arredondo was a council member of the City of Uvalde and the Chief of Police for the UCISD-PD. Arredondo, as the chief policymaker, with final policymaking authority, for the UCISD and the UCISD-PD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Arredondo acted in the scope of his employment, under color of state law, and in his individual and official capacities. Arredondo may be served with process at his home address in the state of Texas at 101 Larkspur Drive, Uvalde, Texas 78801. Defendant Arredondo is sued in his official and individual capacities.

2.36    Defendant **Adrian Gonzalez** is an individual residing in Texas. At all relevant times, Gonzalez was an officer of the UCISD-PD. Gonzalez, as an officer of the UCISD-PD, acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Gonzalez was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Gonzalez may be served with process at his place of employment, UCISD, at 1000 N. Getty Street, Uvalde, Texas 78801. Defendant Gonzalez is sued in his official and individual capacities.

2.37    Defendant **Jesus "J.J." Suarez** is an individual residing in Texas. At all relevant times, Suarez was a UCISD Board Member and, upon information and belief, a reserve officer for the UCISD-PD. Suarez, as an officer of the UCISD-PD, acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Suarez was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Suarez may be served with process at his place of employment, UCISD, at 1000 N. Getty Street, Uvalde, Texas 78801. Defendant Suarez is sued in his official and individual capacities.

2.38    Defendant **Eduardo Canales** is an individual residing in Texas. At all relevant times, Canales was sergeant of the UPD. Canales, as a sergeant of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law and is liable to Plaintiffs. At all relevant times, Canales was acting in the scope of his employment, under the color of state law, and in his individual and official capacities. Canales may be served with process at his place of employment, UPD, at 964 W. Main Street, Uvalde, Texas78801. Defendant Canales is sued in his official and individual capacities.

2.39    Defendant **Mariano Pargas** is an individual residing in Texas. At all relevant times, Canales was a lieutenant and acting chief of the UPD. Pargas, as a lieutenant and acting chief of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant

times, Pargas was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Pargas may be served with process at his home address in the State of Texas at 131 E. Leona St., #131, Uvalde, Texas 78801. Defendant Pargas is sued in his official and individual capacities.

2.40    Defendant **Javier Martinez** is an individual residing in Texas. At all relevant times, Martinez was a lieutenant of the UPD. Martinez, as a lieutenant of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Martinez was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Martinez may be served with process at his place of employment, UPD, at 964 W. Main Street, Uvalde, Texas 78801. Defendant Martinez is sued in his official and individual capacities.

2.41    Defendant **Daniel Coronado** is an individual residing in Texas. At all relevant times, Coronado was a sergeant of the UPD. Coronado, as a sergeant of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Coronado was acting in the scope of his employment, under the color of state law, and in his individual and official capacities. Coronado may be served with process at his place of employment, UPD, at 964 W. Main Street, Uvalde, Texas 78801. Defendant Coronado is sued in his official and individual capacities.

2.42    Defendant **Louis Landry** is an individual residing in Texas. At all relevant times, Landry was an officer of the UPD. Landry, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Landry was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Landry may be served with process at his place of employment, UPD, at 964 W. Main Street, Uvalde, Texas 78801. Defendant Landry is sued in his official and individual capacities.

2.43    Defendant **Donald Page** is an individual residing in Texas. At all relevant times, Page was an officer of the UPD. Page, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Page was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Page may be served with process at his place of employment, UPD, at 964 W. Main Street, Uvalde, Texas 78801. Defendant Page is sued in his official and individual capacities.

2.44    Defendant **Justin Mendoza** is an individual residing in Texas. At all relevant times, Mendoza was an officer of the UPD. Mendoza, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Mendoza was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Mendoza may be served with process at his place of employment, UPD, at 964 W. Main Street, Uvalde, Texas 78801. Defendant Mendoza is sued in his official and individual capacities.

2.45    Defendant **Emmanuel Zamora** is an individual residing in Texas. At all relevant times, Zamora was elected Constable. Zamora, as an elected law enforcement officer, acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Zamora was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Zamora may be served with process at his place of employment, 629 Nicholas Street, Uvalde, Texas 78801. Defendant Zamora is sued in his official and individual capacities.

2.46    Defendant **Johnny Field** is an individual residing in Texas. At all relevant times, Field was elected Constable. Field, as an elected law enforcement officer, acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Field was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Zamora may be served with process at 700 E. Nopal, Uvalde, Texas 78801. Defendant Field is sued in his official and individual capacities.

2.47    Defendant **Texas Department of Public Safety** ("TDPS") is an organization organized under the laws of the state of Texas. TDPS is charged by law with the administration and their operations of, including the employment, control, supervision, discipline, training, and practices of TDPS's personnel and employees, and with the formulation of its policies, practices, and customs. TDPS is legally responsible for the acts and omissions of its employees' policies, practices, and/or customs were moving forces in causing the Plaintiffs resulting damages. TDPS may be served with process through the Uvalde Texas Department of Public Safety, at 2901 E. Main St., Uvalde, Texas 78801.

2.48    Defendant **Joel Betancourt** is an individual residing in Texas. At all relevant times, Betancourt was a captain of the TDPS. Betancourt, as a captain of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Betancourt was acting in the scope of his employment, under color of state law, and in his individual capacity. Betancourt may be served with process at his place of employment, TDPS, 5805 North Lamar Blvd., Austin, Texas 78752. Defendant Betancourt is sued in his individual capacity.

2.49    Defendant **Juan Maldonado** is an individual residing in Texas. At all relevant times, Maldonado was a sergeant of the TDPS. Maldonado, as a sergeant of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Maldonado was acting in the scope of his employment, under color of state law, and in his individual capacity. Maldonado may be served with process at his home address in the State of Texas at 712 E. Oak St., Uvalde, Texas 78801. Defendant Maldonado is sued in his individual capacity.

2.50    Defendant **Christopher Kindell** is an individual residing in Texas. At all relevant times, Kindell was a Ranger of the TDPS. Kindell, as a ranger of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Kindell was acting in the scope of his employment, under color of state law, and in his individual capacity. Kindell may be served

with process at his place of employment, TDPS, 5805 North Lamar Blvd., Austin, Texas 78752. Defendant Kindell is sued in his individual capacity.

2.51    Defendant **Crimson Elizondo** is an individual residing in Texas. At all relevant times, Elizondo was a trooper of the TDPS. Elizondo, as a trooper of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Elizondo was acting in the scope of her employment, under color of state law, and in her individual capacity. Elizondo may be served with process at her home address in the State of Texas at 216 Minter St., Uvalde, Texas 78801.  Defendant Elizondo is sued in her individual capacity.

2.52    Defendant **Juan Hernandez** is an individual residing in Texas. At all relevant times, Hernandez was the Fire Marshal for the City of Uvalde and Uvalde County. Hernandez, as the Fire Marshal, acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Hernandez was acting in the scope of his employment, under color of state law, and in his official and individual capacities. Hernandez may be served with process at his place of employment, the Uvalde Fire Department, 132 Raine Lane, Uvalde, Texas 78801. Defendant Hernandez is sued in his official and individual capacities.

2.53    Defendants **Does 1-2** are officers of the UCISD-PD who were present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and are liable to Plaintiffs. At all relevant times, Does 1-2 were acting in the scope of their employment, under color of state law, and in their individual and official capacities. Does 1-2 are sued in their official and individual capacities.

2.54    Defendants **Does 3-20** are officers of the UPD who were present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and are liable to Plaintiffs. At all relevant times, Does 3-20 were was acting in the scope of their employment, under color of state law, and in their individual and official capacities. Does 3-20 are sued in their official and individual capacities.

2.55    Defendants **Does 21-36** are officers of the UCSO who were present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and are liable to Plaintiffs. At all relevant times, Does 21-36 were was acting in the scope of their employment, under color of state law, and in their individual and official capacities. Does 21-36 are sued in their official and individual capacities.

2.56    Defendants **Does 37-122** are officers of the TDPS who were present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and are liable to Plaintiffs. At all relevant times, Does 37-122 were was acting in the scope of their employment,

under color of state law, and in their individual capacities. Does 37-122 are sued in their official and individual capacities.

2.57    Defendant **Doe 123** is a City of Uvalde Fire Marshal who was present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Doe 123 was acting in the scope of his or her employment, under color of state law, and in his or her individual capacity. Doe 123 is sued in his or her official and individual capacities.

2.58    The Defendants are referred to in this complaint as the "Law Enforcement Defendants." Where applicable, Defendants City of Uvalde, Uvalde Consolidated Independent School District and Uvalde County, and all constituent units thereof, are referred to as "Law Enforcement Municipal Defendants," and Defendants described in paragraphs 2.35 through 2.56 are referred to as "Law Enforcement Individual Defendants."

# III.
## JURISDICTION & VENUE

3.1    This case is brought under 42 U.S.C. § 1983 and under state law. Jurisdiction is conferred on this Court based upon 28 U.S.C. § 1331 and 1343. This Court also has supplemental jurisdiction over Plaintiffs' state law claims and over Defendants under 42 U.S.C. § 1367 because the state law claims are interrelated to the federal claims.

3.2    Venue is proper within the Western District of Texas, Del Rio Division, under 28 U.S.C. Venue is proper within the Western District of Texas, Del Rio Division, under 28 U.S.C. § 139(b)(1) and (2) because at least one Defendant resides within this district, Defendants regularly conduct business in this district, and the events and omissions giving rise to Plaintiffs' claims occurred within the district.

3.3    Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs seek monetary relief OVER ONE MILLION DOLLARS ($1,000,000.00), which is in excess of the jurisdictional limits and a demand for judgment for all the other relief to which Plaintiffs deem themselves justly entitled at the time of filing this suit, which, with the passage of time may change and is within the Court's jurisdictional limits. Because Rule 47 of the Texas Rules of  Civil Procedure requires

Plaintiffs to affirmatively plead the amount of damages sought. Plaintiffs plead for an amount in excess of ONE MILLION DOLLARS ($1,000,000.00) to be determined by the jury.

3.4     Notice was provided on behalf of all Plaintiffs to the various Defendants under the Texas Tort Claims Act and in the case of the United States Border Patrol under the Federal Tort Claims Act.

## IV.
## FACTS

4.1     The Uvalde school shooting was one of the worst shootings in Texas' history. The facts contained in this Complaint were compiled without access to police reports, video statements, or autopsy reports as no state agency nor federal agency responded to open records request nor Freedom of Information requests including the ATF, the Uvalde Independent School District, the District Attorney of Uvalde, the Texas Department of Public Safety, the City of Uvalde, The Uvalde Police Department; in an apparent concerted effort to deny the children and families of Uvalde Texas Due Process of Law; and an attempt to prevent United States Citizens information about what occurred and to help prevent such mass shootings in the future.

### *THE PLAINTIFFS*

4.2     Plaintiff Federico Torres brings this suit individually, as a representative, and as next friend of R.T., who was 10 years old at the time of his death. R.T. was described as an outgoing little boy who loved being outside. He had many hobbies such as Pokémon, playing football, and playing video games. Many describe him as always having a smile on his face. On the day of the shooting R.T. was a student in classroom 111, the same classroom the shooter barricaded himself in for 77 minutes. Unfortunately, R.T. did not survive the brutal attack. The Torres family waited a horrifying 12 hours after learning of the shooting before they found out if R.T. was one of the child victims who would not be coming home that evening. Federico Torres

and his family have lost the love, support, nurture, and companionship they would have shared with their son for the rest of their lives.



*R. T.*

4.3    Plaintiff Arnulfo Reyes is a surviving Robb Elementary School teacher who was shot three times on May 24, 2022, as he attempted to lock the door to his classroom, room 111. Mr. Reyes recalls hearing a loud noise and pieces of wall debris flying through the classroom in the moments leading up to the massacre. Fearing the worst, Reyes ordered his students to get under their desks, but it was too late. The shooter burst into Mr. Reyes' classroom and immediately aimed his firearm at Mr. Reyes and shot twice into his body. The shooter's first shot caused Reyes to fall to the ground and bleed onto the floor as his pupils screamed and fell around him. The shooter thereafter taunted Reyes, unsure if he had murdered his intended victim, as he snatched Reyes' phone and dropped it repeatedly on his back in an attempt to get a reaction, apparently to determine if Mr. Reyes was dead. The shooter intentional dropped blood and cold water onto Mr. Reyes' face to see if he would flinch and was still alive. The shooter, unsatisfied, again fired his modified,

automatic firearm into Mr. Reyes' body. Mr. Reyes was unaware whether he would live or die and feared he would bleed to death. Mr. Reyes was in agony but had to keep still and quiet to avoid being shot again.  Mr. Reyes heard his students screams and cries as they were murdered by the shooter for 77 minutes. Mr. Reyes spent over a month in the hospital after the shooting being treated for his wounds.  He was released in a wheelchair. He walked with a cane, had a plasma machine pumping plasma into the wound on his back and will have permanent damages from these injuries for the rest of his life. Mr. Reyes has not returned to teaching an is likely unemployed for the remainder of his life.  Aside from the mental trauma, anxiety, depression and PTSD that he currently suffers and will in all likelihood suffer for most if not all of his remaining life, he lives with constant pain and will experience that pain for the foreseeable future,



*Arnulfo Reyes*

4.4     Plaintiff Patricia Albarado, a Robb Elementary School teacher, was in her shared classroom 102 on the day of massacre watching a movie with her students and co-teacher Plaintiff Nicole Faye Ogburn. Shortly after 11 A.M., Mrs. Albarado heard loud, pounding noises against

the building. Mrs. Albarado looked outside her classroom room window in horror as she saw the shooter, dressed in black, shooting towards her window. The shooter aimed his modified assault rifle at room 102, fired his rifled, and shattered the window. Mrs. Albarado attempted to protect her young students by informing the class there was a shooter outside and to get low to the ground. Ms. Albarado and her students hid underneath their desks, storage bins, and window curtains. As Ms. Albarado lay in the fetal position on the floor, she recalls hearing at least 800 "shots" fired. Ms. Albarado's co-teacher, Plaintiff Nicole Faye Ogburn called 911. Unknown if the shooter was about to burst into her classroom, Mrs. Albarado texted her husband on her apple watch, *"There is an active shooter, help. I love you."* Mrs. Albarado recalls law enforcement entering her classroom approximately forty minutes after she first saw the shooter outside her window, the time between the events was the most traumatic, anxious times of all in the school life.  She could barely walk, and her legs were numb as the enforcement officials ordered the class to evacuate through the shattered window the shooter broke sometime before. Mrs. Albarado, Plaintiff Nicole Faye Ogburn, and their young students ran across the Robb Elementary School campus to the neighboring Funeral home. As they ran, shots continued to be heard behind them.

4.5     Plaintiff Monica Arriola brings this suit individually and as next friend of J.T., who was 10 years old at the time of the shooting. J.T.  was across the hall from the barricaded room in classroom 104 or 105. The school shooter peered into his classroom window at J.T. as he was terrorizing the school, and in that moment, J.T. thought he was going to die. J.T was one of the last children evacuated from the school by a broken window and Monica Arriola did not reunite with her child until 4 hours after she learned of the shooting.  During his time, Monica Arriola did not know if her son was alive or dead but as with all the parents who did not know if their children were alive, she feared the worst.

4.6     Plaintiff Erica Barrera brings this suit individually and as next friend of D.R., who was 11 years old at the time of the shooting. D.R described hearing a lot of "firework" noises and screams from his classroom 105 on the day of the shooting, before he was evacuated through a broken Robb Elementary School window.  Like most of the Plaintiffs in this Complaint, he was friends with several children who perished in the other classrooms, throughout the ordeal he feared that he would die.

4.7      Plaintiff Michael Brown brings this suit individually and as next friend of V.B., who was 9 years old at the time of the shooting. V.B was in the cafeteria on the day of the shooting when gunshots rang through the school. School staff instructed him to get under the stage, where he was surrounded by the crying and yelling of his fellow classmates. He feared he would die, and the screams of his classmates made the ordeal unbearable. He was evacuated later through the cafeteria front door. V.B. was friends with 2 children that rode his bus that did not survive. He has severe trauma, anxiety and depression as a result of the freighting experience of that day.

4.8     Plaintiff Jennifer Davis brings this suit individually and as next friend of Z.D., who was 10 years old at the time of the shooting. Z.D. was in classroom 103 when the shooter entered the school and was one of the children evacuated by a broken window. It wasn't until 4'oclock in the afternoon that she was reunited with her parent at the civic center. Ms. Davis did not know if her daughter was alive or dead, like most parents, she feared the worst. Z.D. learned in the days after the shooting that her best friend did not survive the massacre.

4.9     Plaintiff Jennifer Gaitan brings this suit individually and as next friend of J.N., who was 10 years old at the time of the shooting. J.N. was in room 108 on the day of the shooting with her classmates. J.N. recalls the screaming and terror she experienced that day. J.N.  witnessed her classmate, and friend, injured when a bullet struck her nose. J.N. also recalls a bullet hitting the

wall of her classroom. J.N. was another student evacuated through the side door at Robb Elementary School. She feared for her life and must live her life with the image of her dead classmates which she cannot escape.

4.10    Plaintiff Angeli-Rose Gomez brings this suit individually and as next friend of G.B and A.G. G.B. and A.G. were both on Campus at Robb Elementary on the day of the massacre, classrooms unknown. It is believed that despite the attempts by law enforcement to prevent her, Ms. Rose-Gomez was able to locate her children and remove them from the horrific hostage situation. As she endured amount condiments and ostracization as a result of her activities to protect her children.

4.11    Plaintiff Luz Hernandez brings this suit individually and as next friend of N.J., who was 9 years old at the time of the shooting. N.J. was in room 114 during the massacre. N.J. remembers his teacher telling his class to hide and get under their desk as gunshots echoed throughout the school. N.J. thought he was being kidnapped as he was evacuated through the school door by law enforcement officials and transported in a van to the civic center. Like most Plaintiffs herein, N.J. lost a few childhood friends due to the actions of the shooter. Like other plaintiffs, he feared for his life throughout the ordeal.

4.12    Plaintiff Carla Rose King, a teacher at Robb Elementary School, had just dismissed her students for lunch and was in her classroom, 129, alone. Mrs. King recalls hearing a sudden and unexpected loud, "bang" noise causing shock and confusion. The bangs continued to ring, and she thought the sounds may be gunshots. Mrs. King peered out her classroom window and did not see anything. She attempted to call the school's front office but there was no answer. She tried to call her daughter, but there was no answer. No one answered. Unknowing and terrified, Mrs. King hid in her room until law enforcement came from the hallway to evacuate her. Unable to move,

she was carried out by officials to the main office of the school before she was transported to the civic center. She remains traumatized, anxious and depressed.

4.13    Plaintiff Tiffany Luna brings this suit individually and as next friend of A.P., who was 9 years old at the time of the shooting. A.P. was located in room 105, across the hall from the barricaded shooter on the day of the incident. A.P. recalls the shooter speaking Spanish in the hallways and saw smoke billowing into her classroom from the constant gunfire. A.P. was evacuated from campus through a broken window. A.P. lost two cousins in the shooting and will be affected by the loss and days events for the rest of her life.

4.14    Plaintiff Tamica Martinez brings this suit individually and as next friend of R.D., who was 10 years old at the time of the shooting. R.D. was in classroom 105 during the massacre before he was evacuated from his classroom through a broken window. As he escaped, he was scratched by glass shards along his arms and backside. R.D. did not reunite with his parents for approximately 4 hours after the ordeal at the civic center. During the excruciatingly long period his parents were not aware if he was alive.

4.15    Plaintiff Tiffany Massey is a Robb Elementary School teacher who was present in her classroom 103 on the day of the shooting with twelve students. Mrs. Massey recalls hearing banging noises coming from the back of her classroom near the parking lot shortly after 11:30 a.m. A student ran up to Mrs. Massey stating that a man was outside with a gun. A teacher in an adjoining room entered classroom 103 and told the class to get down. Wanting to call for aid, Mrs. Massey had left her phone on her desk, so she asked one of her students, Plaintiff Z.D. minor, to borrow her phone. At approximately 11:47 a.m. Mrs. Massey texted 911 and her husband. A 911 dispatcher sent a text message response, "officers were outside." Mrs. Massey recalls the constant gunfire. At no point in the massacre did she receive a notification or alert from alert applications.

Law enforcement appeared outside her classroom window and told her class needed to evacuate through their window and pulled them through the window one by one. Like other teachers and students named herein evacuated by window, Mrs. Massey and her class ran to the nearby funeral home to wait to be transported to the Civic Center.  It is unknown the exact time she was held hostage, but she like the other victims suffered trauma and anxiety as a result of the shooting.

4.16    Plaintiff Yolanda Morales brings this suit individually and as next friend of Z.G., who was 9 years old at the time of the shooting. Z.G. was on campus, outside on the playground, as the shooter approached the school and fired gunshots into the air. Z.G. rushed along with her classmates into the school for cover as her teacher attempted to contact someone on her cell phone. Z.G. heard gunshots, screaming, and her classmates' cries for home. Eventually, Z.G. was evacuated by the school door. Z.G. knew one friend who was injured and one who perished in the massacre. She relives the events as do most of the Plaintiff whenever there is a loud noise or anything that startles her when she has trouble sleeping and something happens that makes her recall the day and the fear of not knowing if she would live.

4.17    Plaintiffs Mark Moreno and Rosemary Moreno bring this suit individually and as next friend of N.M., who was 7 years old at the time of the shooting. N.M was within Robb Elementary School on the day of the shooting, his classroom is unknown. N.M. recalls being evacuated by a broken window. N.M. had one cousin who perished in the incident and knew friends who did not survive.  Like the others, he still relives the incident regularly, including most nights.

4.18    Plaintiff Nicole Faye Ogburn is a Robb Elementary School teacher who shared classroom 102 with Plaintiff Patricia Albarado. Mrs. Ogburn recalls hearing sounds she describes as "metal hitting brick" outside her classroom on the day of the shooting. As she and her co-teacher

investigated the noises, Mrs. Ogburn saw the shooter outside their window, dressed in black, pointing his assault rifle towards the school playground and firing. She, along with Plaintiff Mrs. Albarado ordered their fifteen students to get down. Mrs. Ogburn remembers seeing bullets hitting the classroom window and accumulating on the classroom floor. She and her students crawled on their hands, knees, and stomachs across the classroom floor for cover below the room's built-in cabinets. She used her apple watch to call 911, however her first call failed. She called again, this time the call was answered by a 911 dispatcher, however the call failed again. Mrs. Ogburn called a third time and was connected again to a 911 dispatcher. She quietly whispered into her apple watch that there was an active shooter at the school in the 4th grade building. Afraid to remain on the call, she hung up.  Mrs. Ogburn attempted to console her crying students by holding their hands and praying. A brave student laid his body on top of Mrs. Ogburn in an attempt to protect her. If any teacher or student attempted to stand, they would be in the line of fire. What felt like an hour to Mrs. Ogburn was in reality only a few moments. Thirty minutes after the first shots were fired, law enforcement came into her room searching for the injured and ordering evacuations. Mrs. Ogburn and Plaintiff Mrs. Albarado moved a bookshelf away from the wall so their classroom could evacuate through the broken window. As the students left through the window many were scraped and bruised, cut and bleeding.

    4.19    Plaintiff Mary Ann Reyes brings this suit individually and as next friend of A.S. and A.S., who were 9 and 8 years old at the time of the shooting. 9-year-old A.S was in classroom 106 on the day of the shooting and recalls the "vibrations" from the shooters gun. A.S. was evacuated by a broken window and did not reunite with his parents for approximately 3 hours after his evacuation. Several of A.S.'s friends did not survive. 8-year-old A.S. was also on campus on the date of the incident and located in room 22. A.S recalls he comforted another distressed student

during the massacre and was eventually evacuated by one of the doors. A.S. knew one of the teachers who did not survive. Most of the Plaintiffs lost friends during the shooting who were playing with them one day and never in their lives again after the event.

4.20    Plaintiff Bianca Rivera brings this suit individually and as next friend of G.R. who was 7 years old at the time of the shooting. G.R. was on Campus at Robb elementary on the day of the massacre, classroom unknown.

4.21    Plaintiff Samantha Rodriguez brings this suit individually and as next friend of M.J., who was 10 years old at the time of the shooting. M.J. was in classroom 109 during the events of the massacre. M.J. recalls comforting his classmate during the ordeal when he witnessed his teacher being shot by one of the shooter's bullets and fall to the ground. M.J. was evacuated through a broken window and reunited with his family after approximately 3 hours. M.J.'s best friend and named Plaintiff herein, R.T., was brutally murdered.  The tragedy has resulted in 8–12-year-olds coming face-to-face with their worst fears at an age when they should not be faced with such reality.  It will be with them forever and is one of the major factors in the increased suicide its they face along with higher rates of drug abuse and alcoholism. Despite our best efforts, "normal" has a very different meaning for all of those inside Robb Elementary on May 24, 2022. The rest of us can imagine in our own worst nightmares.

4.22    Plaintiffs Julio and Pricilla Rubio bring this suit individually and as next friend of M.R. who was 10 years old at the time of the shooting. M.R. was in classroom 103. M.R. recalls an immediate fear as soon as she heard the shooter in the school and began to pray. M.R.'s cousin was also in the school and M.R was terrified something bad would happen to her. M.R. was evacuated by a broken window and scraped her leg on the windows broken glass in the process. M.R. was not reunited with her family until the early evening hours at the civic center.

4.23    Plaintiff Briana Ruiz brings this suit individually and as next friend of D.G., who was 9 years old at the time of the shooting. On the day of the massacre, D.G was in room 109. D.G. witnessed the shooter outside his classroom and recalls the shooter mocking him. D.G. was one of the last children evacuated in his classroom by broken window. D.G. arms were scraped and bruised from the window's glass shards. D.G.'s cousin, Eliahna Garcia, did not make it out alive that day. V She has nightmares as a majority of the victims and she can become moody, silent and scares easily.

4.24    Plaintiffs Christian and Brenda Sonora bring this suit individually and as next friend of V.S. who was 10 years old at the time of the shooting. V.S. is a special needs student and was at recess with her classmates when she saw the shooter, dressed in black, approach the school. V.S. witnessed the shooter aim his firearm into the sky and shoot. V.S.'s teacher grabbed V.S., along with two other students, and pulled them into the school restroom, turned off the lights, and told them to be quiet. V.S. recalls watching her teacher remain silent, and texting on her cellphone over and over again. V.S. was evacuated by one of the school doors as her teacher led them out hurriedly. No law enforcement officials came to aid them in their escape. As V.S. escaped the school, she heard shooting and yelling everywhere. V.S. and her classmates ran to the closest highway for refuge. V.S. was reunited down the highway at approximately 12: 30 p.m. on that day. A cousin of V.S. did not survive that day.

4.25    Plaintiff David Trevino brings this suit individually and as next friend of I.T., A.T., and D.T. who were 11, 10, and 8 years old at the time of the shooting.  D.T. was outside the school on campus when he witnessed the shooter approach Robb Elementary School and shoot his firearm into the air. In a fearful state, D.T. entered the school to warn and evacuate his two other siblings before the shooter violently entered. D.T. was successful and the three minors escaped mere

moments after the shooter began firing his weapons into the classrooms. I.T., shocked by the events, experienced a medical emergency, and collapsed on the outdoor school walkway in her escape. I.T. was rushed to the emergency room with heart complications. I.T. has never had a heart condition until the event and it is highly likely the stress, fear and shock caused her heart problems which have continued.

4.26    Plaintiff Krystal Upton brings this suit individually and as next friend of J.T. and B.T. who were 10 and 8 years old at the time of the shooting. J.T. was in classroom 103 as the shooter entered the west door of Robb Elementary School. J.T was evacuated through a broken window and was one of few children evacuated to the nearby funeral home. B.T was also present in the school, he doesn't recall where, he was later evacuated to the civic center.  Both J.T. and B.T.  lost two cousins in the massacre.  Throughout their separation and throughout the event, they feared for their lives.

4.27    Plaintiff Esmeralda Velasquez brings this suit individually and as next friend of C.V., who was 7 years old at the time of the shooting. On the day of the incident, C.V. was in classroom 116 and it is believed she was evacuated by one of the school's back doors.  C.V. was friends with a few of the children who did not survive.

4.28    Plaintiff Sofia Zapata brings this suit individually and as next friend of M.S.., who was 10 years old at the time of the shooting. M.S. was in room 109 during the deadly event. M.S. recalls an individual shooting the window from outside the school.  M.S. was evacuated through a broken school window. M.S. had two cousins who perished on that fateful day, he did not know if the shooting into his classroom would result in his death.

**THE ROBB ELEMENTARY SCHOOL SHOOTING**

4.29    On the morning of May 24, 2022, at Robb Elementary School in Uvalde, Texas, nineteen (19) children and two teachers were killed, and countless others injured and traumatized while school officials and hundreds of law enforcement personnel stood by failing to act. Salvador Ramos, hereafter referred as the "shooter", was an 18-year-old Uvalde man with a history of mental disturbance, instability, and domestic issues illegally purchased semi-automatic weapons, ammunition, high-capacity magazines, and a Hellfire trigger system to use in the massacre. Due to the conduct of the school and police, and the deliberate choices of the gun makers and sellers to directly market their lethal weapons to young untrained civilians, the shooter bought and assembled a military grade assault weapon with 30-round magazines days after his 18th birthday and entered the Uvalde elementary school unabated, wearing tactical gear through an unlocked and/or open door. The shooter was left with free range to shoot, terrorize, and kill children and teachers for over an hour.

4.30    The Plaintiffs herein reasonably believe that sometime in March or April 2022, before the shooter was 18 years of age, he purchased at least one AR style rifle from Daniel Defense, an online retailer or merchant of firearms, without age identifications or proof of age being requested or required by the seller.

4.31    On May 17, 2022, the day after his birthday, the shooter purchased a Smith & Wesson M&P15, AR-15 style, semi-automatic rifle, from Oasis Outback in Uvalde, Texas. Oasis Outback is a local sporting goods store that also serves as a local firearms dealer to complete online purchases made directly from gun manufacturers. On May 17, 2022, Salvador Ramos also purchased 1,740 rounds of 5.56mm 75 grain boat tail hollow points for $1,761.50 shipped directly to his house. No questions were asked as to the need for almost 2,000 rounds of ammunition.

4.32   On May 18, 2022, the shooter returned to Oasis Outback to buy 375 rounds of 5.56 caliber ammunition.

4.33   On May 20, 2022, the shooter returned to Oasis Outback to pick up another weapon, an AR-15 style semi-automatic rifle, DDM4 V7, which he bought directly online from Daniel Defense for $2,054.28. These actions should have all raised questions in the minds of Oasis Outback, but they took no action.

4.34   The facts expose a culture of noncompliance with safety protocols, state-mandated school shooter training, disregard for school alerts, and deliberate indifference to the threat of criminal trespassers and school shooters leaving the children and teachers vulnerable to attack by the shooter. The school doors were unlocked leaving the shooter free to enter. Likewise, Law Enforcement Defendants displayed indifference to the requirements of their position as peace officers, safety guardians, and protectors of students and residents of Uvalde. All Law Enforcement Defendants were required by state law to be competent in active shooter protocol and able to execute the required kill tactics to protect innocent civilians. The Law Enforcement Defendants did not comply with basic principles of active shooter training on May 24, 2022.

4.35   On the morning of May 24, 2022, the shooter sent a Facebook private message to a girl in Germany telling her he shot his grandmother in the head and would shoot up the elementary school.



*Private message from Ramos on Facebook May 24, 2022*

4.36    Shortly after Ramos shot his grandmother in the face, he stole her vehicle and drove to nearby Robb Elementary School. The shooter's grandmother called the Uvalde PD.

4.37    At 11:27 a.m., Robb teacher, Emilia "Amy" Marin exited Robb Elementary School via an exterior door in the west hall to retrieve food for a school party leaving the door propped open with a rock.

4.38    At 11:28 a.m., the shooter crashed his vehicle into a dry ditch near Robb Elementary School. Two people from nearby Hillcrest Memorial Funeral Home approached the crash scene at 11:29:02 a.m. and ran when the shooter shot at them with a rifle. The witnesses called 911.



*Aerial map of Robb Elementary School*

4.39   At 11:29:40 a.m., teacher Emilia Marin returned through the school's west entry exterior door kicking the rock from the door she propped open, then pulled it shut while she continued to look out of the exterior door as she frantically spoke on her cell phone.[1] Ms. Marin attempted to enter a door on the south side of the west hallway only to find it locked.[2] She knocked on the door, and it was eventually answered by another female, whom she advised of the emergency.[3] They moved into classrooms to secure their students.[4] The door is a security door supposed to lock automatically when closed.

---

[1] Robb Elementary School Attack Response Assessment and Recommendations, June 30, 2022 ("ALERRT Report"); *see also* H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 46 (Tex. 2022) ("The surveillance camera inside the west building recorded that someone had propped open the west door with a rock earlier on May 24. *See* Robb Elementary surveillance video. Apparently in response to the lockdown alert, a teacher came into the hallway and removed the rock. *Id.* When the gunman arrived, the door was not propped open by a rock—but because the door was unlocked, he was still able to open the door and enter the building.")
[2] I*d.*
[3] I*d.*
[4] I*d.*

4.40   At 11:30:14 a.m., the shooter, wearing dark clothing and carrying a bag, left the crash scene and climbed a five-foot, chain-link security fence onto the school property and walked across the open grounds between the fence and the teachers' parking lot towards the school buildings on the west side of the school campus.

4.41   Robb Elementary Coach, Yvette Silva, was outdoors on School campus with a group of third graders, and she spotted the shooter's backpack being tossed over the school fence followed by a person dressed in black climbing over it. Coach Silva witnessed the person raise a gun and shoot. Coach Silva thought the shooter was shooting at her, and she ran from the field toward her classroom. She used her school radio to report: "Coach Silva to office, somebody jumped over the fence and he's shooting." Coach Silva expected to hear an announcement of a lockdown, but she did not hear any announcement. Meanwhile, the shooter proceeded through the fourth-grade teacher's parking lot, continuing to fire his gun.

4.42   Robb Elementary Principal, Mandy Gutierrez, was in her office when she heard Coach Silva's report over the radio. Principal Gutierrez attempted to initiate a lockdown on the Raptor application but had difficulty making the alert because of a bad wi-fi signal.[5] She did not communicate the lockdown alert over the school's intercom. Instead, she called and spoke with Chief Arredondo, who told her, "Shut it down Mandy, shut it down."[6] She told head custodian Jaime Perez to ensure that all the doors were locked. She initially locked down in her own office, but she later moved to the cafeteria.[7]

---

[5] DPS Interview of Mandy Gutierrez, Robb Elementary Principal (May 27, 2022).

[6] *Id.*

[7] [48] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June16,2022). Chief Arredondo told the Committee he had no recollection of talking to Principal Gutierrez. Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 161(June21,2022).

4.43   At 11:31:36 a.m., the shooter is seen on video walking between cars shooting, and a Uvalde PD unit is captured arriving at the crash site. [8] At 11:31:43, a.m. a UCISD PD officer drove through the west gate near the crash site and across the field to the south side of the building at a high rate of speed.[9] The shooter was in the parking lot, but the UCISD PD officer did not see him.[10]

4.44   At 11:31 a.m. a teacher frantically called 911 telling dispatch, "He's shooting! "Gun shots are heard in the background while the teacher, terrified, yelled repeatedly for the kids to get to their classrooms.

4.45   At 11:32:08 a.m. the shooter reached the west teachers' parking lot adjacent to the building and fired shots through windows into the westmost classrooms before entering the building.

4.46   At 11:33 a.m., the shooter entered the school through the unlocked, back westside door video showed the shooter open the back westside door. If the door had been locked it would have provided "some" protection for the victims of the shooter.

4.47   Twenty-four seconds after the shooter entered the school and walked down the hallway, shooting over 100 bullets in 2 ½ minutes into the classrooms. There were no School District police inside the school. At 11:33:24 a.m., the shooter fired rounds from the hallway toward classrooms 111 and 112.[11] At 11:33:32 a.m., he entered classroom 111, which was unlocked, and the audio of children screaming was removed from video recordings released to the public.[12]

---

[8] *Id*

[9] *Id*

[10] *Id at 15.*

[11] *Id.*

[12] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 46 (Tex. 20 22).



*The Texas Department of Public Safety diagram of Shooter's path in red.*

4.48   At 11:33:37 a.m., the shooter backed out of classroom 111 into the south hallway and fired shots from the hallway into classroom 112. The shooter then re-entered classroom 111 and continued shooting. The shooter fired over 100 rounds by 11:36:04 a.m., according to audio analysis.[13]

4.49   Two minutes, 57 seconds after the shooting began, the first wave of law enforcement officers entered the school taking positions in the hallway north and south of classrooms 112 and 111. At 11:35:55 a.m. three Uvalde PD officers entered the school through the west exterior door into the west hallway.[14] The officers had external armor, two with concealable

---

[13] Id.
[14] ALERRT Report, at 9.

body armor, two rifles, and three pistols. They had sufficient firepower to take out the shooter but failed to follow protocol.

4.50    At 11:36:00 a.m., four additional law enforcement officers arrived, including two Uvalde PD officers, a Uvalde PD SWAT team commander, and UCISD PD Chief Arredondo. Chief Arredondo was at his office at the Uvalde High School when he heard "shots fired" on the radio. Chief Arredondo drove to Robb Elementary School at 11:36 a.m., unprepared, carrying only a Glock 22 handgun. Chief Arredondo did not bring classroom keys, radio, or protective gear. Chief Arredondo dropped his radios near the school fence stating that they bothered him.[15] Chief Arredondo arrived with another UCISD PD officer and two Uvalde PD officers. They had three external body armor carriers, concealable body armor, and pistols.[16] Again, enough firepower to take out the shooter.

4.51    Chief Arredondo was required by the School District's active shooter plan to set up an outside command post as the on-scene commander, but he failed to set up an outside command post... Chief Arredondo stated the following to the House Committee:

> [W]hile you're in there, you don't title yourself .... I know our policy states you're the incident commander. My approach and thought was responding as a police officer. And so, I didn't title myself. But once I got in there and we took that fire, back then, I realized, we need some things. We've got to get in that door. We need an extraction tool. We need those keys. As far as ... I'm talking about the command part ... the people that went in, there was a big group of them outside that door. I have no idea who they were and how they walked in or anything. I kind of – I wasn't given that direction.

---

[15] Texas House Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).
[16] Id.

\*\*\*

You can always hope and pray that there's an incident command post outside. I just didn't have access to that. I didn't know anything about that.[17]

4.52   No officer from Uvalde PD assumed the role of incident commander either, even in the face of Chief Arredondo's failure to do so. Establishing an incident commander is essential for maintaining effective command and control and establishing a control command away from the action.  This in of it itself is not only a failure of law enforcement on the scene but negligence that establishes the liability of law enforcement.

4.53   Lt. Pargas, the acting Chief of Uvalde PD, told the House Committee that it was his understanding that officers on the north side of the building understood there were victims trapped inside the classroom with the shooter. Lt. Pargas and the officers on the north side of the building were waiting for other personnel from the Department of Public Safety or BORTAC to arrive with better equipment like rifle-rated shields.

4.54   The portable radio communication devices used by UCISD PD, and other law enforcement officers did not work inside the school building, and officers had to step 10 feet away from the school to receive signals. Radio communication devices used by Border Patrol agents did work, but poorly.[18]  These devices account for the "real" property requirement of the Texas Tort Claims Act is such and necessary.  The failure to ensure law enforcement had working communication devices is further evidence of the negligence that led to Plaintiffs damages.

4.55   The shooter was actively firing his AR-15 until 11:36:04 a.m. Ms. Ava Mireles, a teacher in the school, called her husband, Ruben Ruiz, a UCISD PD police officer, and told him

---

[17] Texas House Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).
[18] Texas House Committee testimony of Texas Department of Public Safety Director Steve McCraw (June 21, 2022).

she was shot and dying. At 11:36 a.m. Officer Ruiz checked his phone, and a few minutes later, told the other officers his wife was shot. After Ms. Mireles was shot, her phone slipped, and a female student grabbed it and called 911. She called several times, asking them to send the police.

4.56    At 11:37:00 a.m. Uvalde PD officers converged on rooms 111 and 112 led by Lt. Martinez and Sgt. Eduardo Canales but retreated when the shooter fired.[19] UCISD PD and Uvalde PD police did not make another attempt at the shooter for more than an hour, when U.S. Border Patrol officers arrived.[20] All government law enforcement failed to follow active shooter protocol, violating their duty to Plaintiffs, and causing severe damages.  In light of what happened it is not understandable how so many law enforcement officers have failed to follow their trainings, protocol or to simply do the honorable thing and take out the shooter, thereby saving the school children from a large portion of the effects of this horrific ordeal.  Instead, the officers looked to someone else to make the decisions for them, failed to follow protocol or training, and left the victims to the lifelong agony their experience.

4.57    At 11:43 a.m., Chief Arredondo called for more firepower because he only had a pistol. Chief Arredondo gave orders to officers to stand down while the shooter was shooting teachers and students trapped in classrooms 111 and 112. Audio recordings confirm shooting was ongoing: 11:40:58 a.m., the shooter fired a shot, at 11:44:00 a.m., the shooter fired another shot, and at 12:21:08 p.m., the shooter fired 4 more shots.[21]  Each shooting indicated this was an "active" shooter requiring protocol be followed. It was not. Video footage shows numerous officers standing in the school, just waiting.

---

[19] ALERRT Report, at 15.
[20] *Id.* at 17.
[21] ALERRT Report, at 17.



*Video Footage from inside Robb Elementary School*

4.58    Law enforcement from various agencies (including Uvalde PD, UCISD PD, Uvalde County Sheriff's Department, Fire Marshals, Constable Deputies, Southwest Texas Junior College Police Department, and the U.S. Border Patrol) arrived on or before 11:51:20 a.m.[22] There were approximately 376 law enforcement officers at the school, while terrified students and teachers were held hostage inside classrooms.

4.59    The first 911 call came from a female student at 12:03 p.m. She called several times over the next 13 minutes, telling officials there were multiple people dead and stated at 12:16 p.m., that there were eight to nine students alive.

4.60    A 911 call was placed by a student in an adjoining classroom at 12:19 p.m. Another call from Robb Elementary School came three minutes later where three gunshots can be heard. Chief Arredondo, and other law enforcement officers inside were unaware of the 911 calls. This fact indicates aa total breakdown in communication.  Since law enforcement failed to follow their training or protocol it is unknown what knowledge of the 911 calls would have done – but one can

---

[22] ALERRT Report, at 8.

only hope it would have spared them to some type of action that led to the freedom of the students and teachers.

4.61     The initial female student called 911 again at 12:36 p.m. The student was told to "stay on the line and to be quiet." The student told the dispatcher "He shot the door," and hung up in 21 seconds. Minutes later, the child called to plead: "Please send the police now."

4.62     The U.S. Border Patrol officers entered the classroom, more than an hour after the shooter's arrival on campus and shot him. At 12:51 p.m., officers were moving children out of the room," according to DPS Director McGraw.

4.63     The ALERT June 30, 2022, report contains a timeline of events:

INTENTIONALLY LEFT BLANK



*ALERT Exigency vs. Capability Timeline*

4.64   From 12:21:16 p.m. until 12:34:38 p.m., Chief Arredondo discussed tactical options and considerations including snipers, windows, a master key, and how to get into the classroom with a Uvalde PD officer; who had the keys, testing keys, the probability of the door being locked; and, if children and teachers were dying or dead.[23] When the keys arrived, Chief Arredondo tried them, on a different door, but none worked. Chief Arredondo failed to ask the

---

[23] ALERRT Report, at 9.

nearby school principal or the head custodian for the master key. The door to classroom 111 was probably not locked according to the House Committee investigation.[24]   The failure of law enforcement officers to check to see if the door was locked has never been addressed and can only be considered negligence on the part of all around.

4.65   As these events were unfolding in the building, parents and family members of the students gathered in large numbers outside of the school. Parents yelled at officers to go in. Many family members, hearing gunfire and seeing no discernable police response, wanted to go into the classroom themselves. Officers began restraining and tackling people outside. Other parents were tased, handcuffed, and pepper sprayed outside the building, all while the police failed to engage the shooter.  If the officers used the same efforts on the shooter as was on the parents wanting to save their children, the entire event could have turned out differently.  Instead of the blemish on the reputation of the Uvalde Police, DPS, Texas Rangers and even under the Border Patrol, all law enforcement present, the children will face lifelong issues as a result of the complete failure of law enforcement.

4.67   At 12:50:03 p.m., 77 minutes after the massacre began, U.S. Border Patrol officers breached the door of Room 111 using a ballistic shield and fatally shot the shooter.[25] Local law enforcement officers, including UCISD PD, Uvalde PD officers, and Uvalde Sheriff Dept waited outside of the classroom for approximately 50 minutes while children repeatedly called 911 pleading for help.

---

[24] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 71 (Tex. 2022).
[25] ALERRT Report, at 11.

**THE SCHOOL DISTRICT'S AND LAW ENFORCEMENT'S FAILURE TO FOLLOW STATE ACTIVE SHOOTER MANDATES AND THEIR OWN WRITTEN POLICIES**

4.66    Active shooter protocols for school shootings, developed after the 1999 Columbine massacre, require law enforcement officials responding to a school shooter to immediately target the subject, even if it means putting themselves in harm's way. In 2019, the Texas Legislature passed House Bill 2195, effective June 14, 2019, requiring all school district police officers to complete an active shooter response training program approved by Texas Commission on Law Enforcement ("TCOLE") and for all districts to develop an active shooter plan.[26] Jon Rosenthal, Texas House of Representatives, District 135, told National Public Radio, the Uvalde School District received money from the Texas Legislature specifically for training, for equipment and for updating the school's security.[27] HB 2195 required that school police take standardized active shooter training emphasizing confronting the shooter quickly.

4.67    The active shooter protocols direct officers to "isolate, distract, and neutralize:"

4.69    Uvalde CISD adopted an active shooter response policy on April 15, 2020, as passed by the Texas legislature in 2019. Every school officer in Texas must be trained on how to respond to an active shooter. The main tenets of active shooter response stem from lessons learned from the Columbine High School mass shooting in 1999. Priority number one is to stop the killing. Responding officers must have the tools and training to immediately make entry and take out an active shooter. And if they lack one or both, officers were still expected to stop the shooter. The "Priority of Life Scale" dictates that innocent civilians are prioritized over law enforcement and other responders. According to active shooter training from the ALERRT Center—which the FBI

---

[26] Tex. H.B. 2195, § 1, 86th Leg., R.S. (2019) ("A school district shall include in its multihazard emergency operations plan a policy for responding to an active shooter emergency. The school district may use any available community resources in developing the policy described by this subsection."), codified as Tex. Educ. Code § 37.108.
[27] Id.

has recognized as the national standard—after Columbine, "[f]rom that moment forward, every law enforcement officer was expected to be willing to risk his or her life without hesitation." The legislators mandate establishes the negligence of all law enforcements on the scene.

4.70    TDPS Director Steven McCraw confirmed this was the standard all the responding officers to Robb Elementary were expected to meet during a press conference three days after the shooting. McCraw said every officer was trained to immediately neutralize active shooters. "When there is an active shooter, the rules change," he said at the press conference. "Texas embraces active shooter training, active shooter certification, and that doctrine requires officers—we don't care what agency you're from. You don't have to have a leader on the scene. Every officer lines up, stacks up, goes and finds where those rounds are being fired at and keeps shooting until the subject is dead, period."

4.71    Officers of the Uvalde Police Department, including Defendants Eduardo Canales, Mariano Pargas, Daniel Coronado, Javier Martinez, and Louis Landry were among the first law enforcement officers to arrive on the scene. Defendant Canales, who was responding to a report of a car crash and shots fired, saw Ramos shooting his gun as he arrived at the school. At this time, Defendant Canales was the commander of the Uvalde PD SWAT team.

4.72    Chief Arredondo was required to develop and implement an active shooter plan under HB 2195. On April 15, 2020, Chief Arredondo and Director of Student Services, Kenneth Mueller, prepared and adopted, "Annex 1 Active Shooter."[28] The plan recognized that "[t]he district has primary responsibility for the health and safety of students, staff, substitute teachers, and visitors while on district property and shall ***coordinate the law enforcement***, health, and

---

[28] *See* Uvalde Consolidated ISD, Annex 1: Active Shooter ¶ I ("The Uvalde CISD police department along with the Director of Student Services makes recommendations and creates plans to develop a safe environment and to lead the District to Mitigate, Prevent, Prepare, Respond, and Recover from potential active shooter situations.").

medical services with other first responders.[29]   Unfortunately, they failed miserably and cannot even contend they were negligent.

4.73    Defendant Pargas, as acting chief of the Uvalde PD, was a policy maker with final policymaking authority. By choosing not to follow the active shooter policy, Defendant Pargas created a new policy. This policy was to barricade children inside a classroom with an active shooter, delaying emergency medical and rescue services and depriving them of the comfort of their family.  The actions of law enforcement did not meet their duty to Plaintiffs, instead, they worsened the ordeal all inside the school or present at Robb Elementary on May 24, 2022, had to undergo.

4.74    In fact, there was no central command post set up outside the building, causing a dangerous lack of coordination and an ineffective response. No one took charge of the scene. No one was evaluating the information as it came in and ensuring that there were adequate supplies and equipment. Each of these failures worsened the situation. And each of these was directly in contravention of the principles of active shooter response, principles in which every Law Enforcement Individual Defendant should have been prepared and adequately trained.

4.75    Moreover, Robb Elementary School Principal Gutierrez confirmed during her committee testimony that school administration **_knew_** about the issues with classroom door 111, stating it was reported around spring break of 2022.[30]

4.76    The School District had a history of failing to protect students against trespassers. In the last year, there were incidents where the school district had to shut down Robb Elementary

---

[29] *Id.* ¶ IV.B.4.f.
[30] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

because trespassers were on school property. The school never addressed or fixed its security issues.[31]

4.77    School alerts and school trespassers were not treated with urgency by the School District and its staff; in part because of the regularity of school alerts from area "bailouts" created lessened security vigilance. School District administrators and the Uvalde PD initially thought the shooting was likely a "bailout" situation.[32] The incidence of school shootings however made compliance with security protocols urgent, demanding the School District and local police to be hyper vigilant.

4.78    Throughout this period, officers employed by the Law Enforcement Municipal Defendants failed to follow active shooter protocols.

4.79    The Law Enforcement Individual Defendants acted in reckless disregard of Plaintiffs' clearly established constitutional rights in treating the situation as a "barricaded subject" situation when all indications were that the situation involved an active shooter. Their actions were reckless, unconscionable, unreasonable, and contrary to clearly established protocols for responding to an active shooter.

4.80    Thus, they did not follow the first principle of active shooter response: immediately distract, isolate, and neutralize the active shooter. They did not do what they should have been trained to do: stop the killing, prevent the hostage situation.

4.81    The Law Enforcement Municipal Defendants failed to train and supervise their employees, resulting in a law enforcement response to the shooting at Robb Elementary that

---

[31] *See* Michael Martinez CNN interview. June 2022.
[32] The possibility of a bailout "came over my mind at some point … because they happen so often, and there's been a few that were armed." Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

worsened the danger and resulted in children being trapped in a classroom with their murderer for 77 minutes as the shooter continued killing and torturing his victims.

4.82    In the alternative, the final policymaking decisionmakers, Defendants Pargas and Arredondo, and Defendant Doe from Uvalde County, overrode their active shooter protocol and made a new policy to treat Ramos as a barricaded subject, contrary to the clear facts in front of them as well as the existing active shooter policy.

4.83    The Law Enforcement Municipal Defendants' failures were so extensive that even basic steps for mass casualty events were not taken.

4.84    The effect was to trap the injured and dying and prolong the time the shooter had to murder additional children and adults, inside classrooms 111 and 112. Plaintiffs were deprived of access to emergency medical and rescue services and of the comfort of their families—who were just outside the law enforcement perimeter.

## V.
## CAUSES OF ACTION
## FIRST CAUSE OF ACTION

42 U.S.C. § 1983 – Fourth and Fourteenth Amendments Unlawful Seizure
(By All Plaintiffs Against Law Enforcement Individual Defendants in their individual capacities, and all Law Enforcement Individual Defendants except the TDPS officers in their official capacities)

5.1    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

5.2    The Fourth Amendment to the Constitution of the United States protects individuals, including Plaintiffs, from unreasonable seizures at the hands of law enforcement. This protection has been incorporated against state and local actors, via the Fourteenth Amendment.

5.3    By using force to involuntarily confine Plaintiffs, and other students and teachers,

inside Robb Elementary School and classrooms 111 and 112 with Ramos, the Law Enforcement Individual Defendants illegally seized Plaintiffs, in violation of the clearly established rights secured to them by the Fourth and Fourteenth Amendments.

5.4     The Law Enforcement Individual Defendants were deliberately indifferent to the constitutional rights of Plaintiffs and the other victims of the shooting at Robb Elementary.

5.5     As a direct and proximate result of the Law Enforcement Individual Defendants' misconduct detailed above; Plaintiffs sustained the damages alleged herein.

5.6     The Law Enforcement Individual Defendants' misconduct proximately caused the Plaintiffs' emotional pain and mental anguish, which they anticipate will last for the rest of their lives. The same misconduct proximately caused Plaintiffs to suffer and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

## SECOUND CAUSE OF ACTION

42 U.S.C. § 1983 – Fifth and Fourteenth Amendments
Substantive Due Process – State Created Danger & Custodial Relationship
(By All Plaintiffs Against Law Enforcement Individual Defendants in their individual capacities, and all Law Enforcement Individual Defendants except the TDPS officers in their official capacities)

5.7     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

5.8     The Fifth Amendment to the Constitution of the United States creates a right to not be deprived of life without due process of law. This protection has been incorporated against state and local actors, via the Fourteenth Amendment.

5.9     While this protection may not always require governmental actors to protect the public from private actors, where harm inflicted by a private party also flows from a danger a state

actor has knowingly created, that violates the Fourteenth Amendment's substantive due process protections.

5.10    A second exception to the rule exists where individuals are in the custody of the state. In cases in which an individual is in the custody of the state, the state has a duty of care towards that individual.  By using force to barricade Plaintiffs, and other students and teachers, inside Robb Elementary and in their classrooms, the Law Enforcement Individual Defendants illegally created a dangerous environment for Plaintiffs in which they were stripped of means to defend themselves and cut off from sources of aid, in violation of the rights secured to them by the Fifth and Fourteenth Amendments to the Unites States Constitution.

5.11    Plaintiffs were in the custody of the Law Enforcement Individual Defendants because they took steps to "establish a perimeter," and involuntarily confined the Plaintiffs within the school.

5.12    The Law Enforcement Individual Defendants thus had a duty of care to Plaintiffs which they breached by delaying their entry to the classrooms for well over an hour, thus denying them access to emergency medical and rescue services and the comfort of their families.

5.13    The Law Enforcement Individual Defendants were deliberately indifferent to the constitutional rights of Plaintiffs and the other victims of the shooting at Robb Elementary.

5.14    As a direct and proximate result of the Law Enforcement Individual Defendants' misconduct detailed above; Plaintiffs sustained the damages alleged herein.

### THIRD CAUSE OF ACTION

42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Unlawful Seizure
(By All Plaintiffs Against Law Enforcement Municipal Defendants)

5.15    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

5.16    A municipality may be held liable under 42 U.S.C. § 1983 for "failure to supervise or train," where the (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009).

5.17    The Law Enforcement Municipal Defendants failed to adequately train, supervise, and discipline the Law Enforcement Individual Defendants regarding how to identify and respond to an active shooter situation. The result was that law enforcement officers employed by the Law Enforcement Municipal Defendants used force to involuntarily confine Plaintiffs, and other students and teachers, inside Robb Elementary classrooms with Ramos, and the Law Enforcement Individual Defendants illegally seized Plaintiffs, in violation of the clearly established rights secured to her by the Fourth and Fourteenth Amendments.

5.18    By virtue of these actions, the Law Enforcement Municipal Defendants were deliberately indifferent to the constitutional rights of Plaintiffs and the other victims of the shooting at Robb Elementary.  Failure to follow the legislatively mandated active shooter protocol was negligence, gross negligence, conscious indifference and willful misconduct and resulted in prolonging the hostage situation, killing and carnage, indeed the lack of medical attention can be directly attributed to the failure of law enforcement to follow their own procedures.

5.19    As a direct and proximate result of the failure to adequately train, supervise, and discipline the Law Enforcement Individual Defendants regarding how to identify and respond to an active shooter situation, Plaintiffs sustained the damages alleged herein.

5.20    A municipality may also be held liable under 42 U.S.C. § 1983 for action taken pursuant to a municipal policy. "a single decision by a policy maker may, under certain

circumstances, constitute a policy for which the County may be liable." *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 462 (5th Cir. 2000).

5.21    Defendants Pargas and Arredondo, acting as final policymakers, decided to disregard the active shooter policy and instituted a policy to barricade Plaintiffs and the other students and teachers inside the school with a killer, thus seizing them unreasonably and depriving them of emergency medical and rescue services and the comfort of their loved ones.

5.22    As a direct and proximate result of this policy, Plaintiffs sustained the damages alleged herein.

### FOURTH CAUSE Of ACTION

42 U.S.C. § 1983 – Fifth and Fourteenth Amendments
Substantive Due Process – State Created Danger & Custodial Relationship
(By All Plaintiffs Against Law Enforcement Municipal Defendants)

5.23    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

5.24    A municipality may be held liable under 42 U.S.C. § 1983 for "failure to supervise or train," where the (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009).

5.25    For the reasons set forth above, the Law Enforcement Individual Defendants have violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

5.26    The Law Enforcement Municipal Defendants failed to adequately train, supervise, and discipline the Law Enforcement Individual Defendants regarding how to identify and respond to an active shooter situation. The result was that law enforcement officers employed by the Law

Enforcement Municipal Defendants used force to barricade Plaintiffs, and other students and teachers, inside Robb Elementary School with Ramos and illegally created a dangerous environment for Plaintiffs in which they were stripped of means to defend themselves and cut off from sources of aid, in violation of the rights secured to them by the Fifth and Fourteenth Amendments. Further, Plaintiffs were in the custody of law enforcement officers employed by the Law Enforcement Municipal Defendants because they took steps to "establish a perimeter," and involuntarily confined Plaintiffs within Robb Elementary. This denied them access to emergency medical and rescue services.

5.27    By virtue of these actions, the Law Enforcement Municipal Defendants were deliberately indifferent to the constitutional rights of Plaintiffs and the other victims and bystanders of the shooting at Robb Elementary.

5.28    As a direct and proximate result of the failure to adequately train, supervise and discipline the Law Enforcement Individual Defendants regarding how to identify and respond to an active shooter situation, Plaintiffs sustained the damages alleged herein.

5.29    A municipality may also be held liable under 42 U.S.C. § 1983 for action taken pursuant to a municipal policy. "a single decision by a policy maker may, under certain circumstances, constitute a policy for which the County may be liable." *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 462 (5th Cir. 2000).

5.30    Defendants Pargas and Arredondo, acting as final policymakers, decided to disregard the active shooter policy and instituted a policy to barricade Plaintiffs and the other students and teachers inside Robb Elementary with a killer, thus taking them into their custody and increasing the danger to them, while also depriving them of emergency medical and rescue services and the comfort of their loved ones.

5.31    As a direct and proximate result of this policy, Plaintiffs sustained the damages alleged herein.

## VI.
## DAMAGES

## A.    AS TO PLAINTIFF FEDERICO TORRES INDIVIDUALLY, AS THE REPRESENTATIVE OF THE ESTATE AND AS NEXT FRIEND OF R.T., (10 YEARS OF AGE)

6.1    Plaintiff Federico Torres brings this suit individually and as next friend of R.T., who was 10 years old at the time of his death. Federico Torres and his family have lost the love, support, nurture and companionship they would have shared with their son for the rest of their lives. Further, as a result of the wrongful death of R.T., his estate is entitled to seek damages for the pain, suffering, and mental anguish he suffered prior to his death, including the damages incorporated herein stated above, but also the damages his estate will have incurred for his funeral and burial expenses.

6.2    Damages loss of inheritance under Wrongful Death Act.

6.3    The specific element of damages suffered by Federico Torres individually and as next friend of R.G., will be more fully described in the discovery process. Plaintiffs preserve the right to plead additional and more specific damages in the future as more facts become known. The above-mentioned elements of damages are those that Plaintiffs have suffered in the past up to the time of trial, but in addition, those that they, in reasonable probability, will continue to suffer in the future.

## B. - DAMAGES AS TO PLAINTIFF ARNULFO REYES

6.4    Plaintiff Arnulfo Reyes is the surviving teacher who was shot three times on May 24, 2022, as he attempted to lock the door to his classroom. Mr. Reyes heard his students murdered and was thereafter alone in the room with the shooter and under the victims' bodies for 77 minutes

unaware whether he would live or die bleeding, suffering and being tortured as the shooter repeatedly dropped his phone on Mr. Reyes' back to see if he flinched and eventually put first victims blood, then cold water on Mr. Reyes' face in an effort to see if he was alive, resulting in his being shot again in the back.

6.5     Plaintiff Arnulfo Reyes suffered injuries to his arm, back, and other parts of his body as a result of gunshot wounds inflicted by Defendant Salvador Ramos. In all reasonably probability, Plaintiff Arnulfo Reyes will continue to suffer in this manner for a long time into the future, if not for the remainder of his natural life. The injuries have had a serious effect on Plaintiff Arnulf Reyes' health and wellbeing. Plaintiff Reyes was tortured for 77 minutes as a result of the various Defendants and law enforcements failures.  The amount of mental anguish, pain and suffering from this is unimaginable.  Suffice to say, a billion dollars could not adequately compensate Arnulfo Reyes for the effects of those 77 minutes or the suffering he will experience foe the rest of his life.

6.6     Plaintiff is entitled to seek damages for the pain, suffering, and mental anguish he suffered, including the damages incorporated herein stated above, but also actual damages to repair the wrongs or to compensate for severe physical injuries.

6.7     General damages which are the unusual accompaniment of this particular type of wrongdoing, that is the Plaintiff has incurred extreme physical suffering and disability, and loss of employment.

6.8     Special damages arising from acts which are foreseeable.

6.9     Reasonable and necessary medical expenses.  Mr. Reyes has incurred numerous medical bills and hospital bills due to his severe and life-threatening injuries.

6.10     Future medical expenses reasonable probability that they will incur in the future.

6.11    Physical pain and suffering.

6.12    Mental pain and suffering.

6.13    Mental anguish, more than anguish and resentment, that is grief, severe disappointment, indignation, wounded pride, shame despair, public humiliation: severe disruption in daily routine.  Both, in the past, and that he will reasonably experience for the rest of his life.

6.14    Loss of his income from his flower and gift shop, that is Arnie's Nursery and Gifts, on 640 N Grove St., Uvalde, Texas 78801; that is approximately $16,000.00 per year.

6.15    Physical impairment and loss of enjoyment of life, loss of Plaintiff's former lifestyle, including loss of ability to play sports, have a normal social life loss of service his mother to perform household services in to administer to the needs of his mother, Rosemary Reyes, who he lived with and now must aid him.

6.16    Loss of consortium parent-child relationship loss of companionship.  Arnulfo Reyes' Mother, Rosemary Reyes, who has suffered loss of consortium with her adult child. Therefore, in her elderly years she lost the companionship of her son and is now facing a lifetime of acting as a caregiver for her adult son when if not for the actions of the Defendants jointly and severally, he would have been her caregiver in the waning years of his life.

6.17    Loss of impairment of past and future earnings capacity. The Plaintiff is disabled as a schoolteacher and disabled from performing any job or occupation due to his severe injuries. Therefore, the Plaintiff has lost wages as a schoolteacher throughout his life; lost wages at his flower shop; lost retirement income due to his lost wages and his inability to pay into his retirement income.

6.18    The specific element of damages suffered by Arnulfo Reyes will be more fully described in the discovery process. Plaintiffs preserve the right to plead additional and more

specific damages in the future as more facts become known. The above-mentioned elements of damages are those that Plaintiffs have suffered in the past up to the time of trial, but in addition, those that they, in reasonable probability, will continue to suffer in the future.

## C. - DAMAGES AS TO PLAINTIFF DAVID TREVINO, INDIVIDUALLY AND AS NEXT FRIEND OF I.T. A MINOR (11 YEARS OF AGE)

6.19    Prior to the hostage, kidnapping situation, I.T. was a healthy, normal, 11-year-old. As a result of the damage inflicted upon her by Defendants, she has suffered severe personal injuries including the onset of heart problems directly attributed to the Defendants actions. She has also exhibited self-harming behavior, been under suicide watch and hospitalized as a result of mental anguish, anxiety, suicidal tendencies, depression and the overall deterioration of her health. Prior to the incident she had not and was not suffering from any of these conditions.

6.20    David Trevino is entitled to seek damages for the pain, suffering, and mental anguish he suffered, including the damages incorporated herein stated above, but also actual damages to repair the wrongs or to compensate for severe physical injuries. Also, the mother seeks damages both individually and to the family relationship through her husband, David Trevino.

6.21    General damages which are the unusual accompaniment of this particular type of wrongdoing, that is the Plaintiff has incurred extreme physical suffering and disability, and loss of employment.

6.22    Special damages arising from acts which are foreseeable.

6.23    Reasonable and necessary medical expenses.

6.24    Future medical expenses reasonable probability that they will incur in the future.

6.25    Physical pain and suffering.

6.26    Mental pain and suffering.

6.27    Mental anguish more than anguish and resentment, that is grief, severe

disappointment, indignation, wounded pride, shame despair, public humiliation: severe disruption in daily routine. The mental anguish of his family has been enormous long of the extraordinary physical injuries to the daughter/sister resulting from the Defendants actions.

6.28    Physical impairment and loss of enjoyment of life, loss of Plaintiff's former lifestyle, including loss of ability to play sports, or have a normal social life.

6.29    Loss of impairment of past and future earnings capacity.

## D. - DAMAGES AS TO ALL PLAINTIFFS

6.30    As a proximate cause of Defendants' conduct, Plaintiffs FEDERICO TORRES, Individually and as Representative and ANF of R.T., Deceased Minor; et. al. suffered, and continue to suffer damages, increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

6.31    As a proximate cause of Defendants' conduct, the adult Plaintiffs, parents and guardians, of the children present at the shooting at Robb Elementary School suffered loss of consortium and/or companionship with their children, emotional stress, lost wages on the day of the shooting, lost wages as to time off from work to take their children to medical, psychological, and psychiatric problems, and emotional problems such as loss of sleep, weight gain and/or weight loss, additional time to devote to their children's emotional needs, and will continue to incur these losses and expenses in the future.

6.32    As a proximate cause of Defendants' conduct, the children present at the shooting at Robb Elementary suffered emotional stress; physical and emotional damages; increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including

considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

6.33    The Plaintiffs, that is the adults and their children, suffered non-economic damages, that are, mental or emotional pain or anguish, loss of consortium, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than actual damages.

6.34    Special damages arising from acts which are foreseeable.

6.35    Prejudgment interest.

6.36    Post-judgment interest

6.37    Reasonable and necessary medical expenses.

6.38    Future medical expenses reasonable probability that they will incur in the future.

6.39    Mental pain and suffering; that is, Mental anguish more than anguish and resentment grief, severe disappointment, indignation, wounded pride, shame despair, public humiliation; severe disruption in daily routine; and foreseeable Bystander anguish.

6.40    As to the parents and guardians: loss of Consortium of parent-child relationship; that is, loss of companionship which is relatively severe to affect relationship with their children.

6.41    Subsequent aggravation by plaintiff or third-party recoverable traceable to primary negligence cut off:

      a.  Past medical expenses;

      b.  Future medical expenses;

      c.  Pain and suffering in the past;

      d.  Pain and suffering in the future;

      e.  Mental anguish in the past;

f.   Mental anguish in the future;

g.   Bystander damages;

h.   Lost wages;

i.   Prejudgment interest;

j.   Post judgement interest;

k.   Exemplary damages;

l.   Loss of enjoyment in life in the past;

m.  Loss of enjoyment in life in the future;

n.   Other reasonable consequential damages.

6.42    Personal injury damages including loss of wage-earning capacity in the future, medical expenses, mental anguish, and damages to the person of each plaintiff.

6.43    Plaintiffs herein suffered injuries due to the events that occurred on May 24, 2022. These injuries include, but are not limited to, post-traumatic stress disorder, fear, nightmares, extreme anxiety, depression, and insomnia. In all reasonably probability, Plaintiffs will continue to suffer in this manner for a long time into the future, if not for the remainder of their natural lives. The injuries have had a serious effect on bystander mental anguish for the injuries caused to third person, by a closely related person, mental anguish for a family member, which listed in the wrongful death act; reasonable without proof of physical injury suits based upon an intentional or willful act; disfigurements scarring, amputations deformity changes in appearance; can be proved by plaintiffs testimony and inspection by the jury; physical impairment loss of enjoyment of life-loss of Plaintiff's former lifestyle, including loss of ability to play sports, have a normal social life loss of service increase capacity of the injured spouse to perform household services in to administer to the needs of the other spouse and family evidence of what services the spouse cannot

perform.

6.44    Loss of service of minor child, and the evidence of minors and their capacity to perform services, which may be inferred from child's personality and family relationships.

6.45    Actual damages to repair the wrongs or to compensate for severe physical injuries.

6.46    "Compensatory damages", that is economic and noneconomic damages.  The term does not include exemplary damages.

6.47    "Future damages" means damages that are incurred after the date of the judgment. These include medical bills, loss of wages, impaired earning capacity.

6.48    "Future loss of earnings" means a pecuniary loss incurred after the date of the judgment, including loss of income, wages, or earning capacity, and loss of inheritance.

6.49    The specific elements of damages suffered by each Plaintiff will be fully described during the discovery process.  The Plaintiffs preserve the right to plead additional and more specific damages in the future as more facts become known. The above-mentioned elements of damages are those that Plaintiffs have suffered in the past up to the time of trial, but in addition, those that they, in reasonable probability, will continue to suffer in the future.

6.50    The Plaintiffs intend to and will amend their Original Complaint to more specifically document the mental anguish and pain and suffering claims of the hostage clients, including listing those Plaintiffs who suffered physical injuries during the hostage ordeal or in escaping from it.  These include the "special needs" child who was instructed to run as far from the school as she could and was located hours later by her father 2-3 miles from the school unsure what had happened, frightened, abandoned and alone, afraid everyone she relied on had been filled.

## VII.
## WRONGFUL DEATH AND SURVIVAL CLAIMS

7.1    Plaintiff Federico Torres is the statutory beneficiary of the deceased. Plaintiff

Torres is therefore entitled to bring these causes of action pursuant to the Texas Wrongful Death Act and Texas Survival Statutes set out in Texas Civ. Prac. & Rem. Code Ch. 71. Plaintiffs, as heirs and next friend of R.T. seek damages for the injuries and deaths of the deceased and their own consequent injuries and damages against Defendants.

### VIII.
### SPOILIATION

8.1    Plaintiffs demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the Uvalde school shooting or other violations made the basis of the Complaint and the alleged damages, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence. Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation inference rule- an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.  This includes the actual buildings themselves as they constitute evidence of the negligence of the various Defendants.

### DEMAND FOR A JURY TRIAL

Plaintiffs respectfully demand a trial by jury.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request judgment against Defendants as follows:

    a.   Compensatory damages against all Defendants in an amount to be determined at trial;

    b.   Punitive/ exemplary damages against the Law Enforcement Defendants in an amount to be determined at trial;

    c.   Reasonable attorneys' fees and costs;

d.   Pre-and post-judgment interest; and

e.   Such other and further relief as this Court may deem just and proper.

June 15, 2023.

Respectfully submitted,

**WILLIAMS ATTORNEYS, PLLC**

By: /s/ *Justin L. Williams*
JUSTIN L. WILLIAMS
SBN: 21555800
500 N. Water Street, Suite 500
Corpus Christi, TX 78401
Telephone: (361) 885-0184
Facsimile: (361) 885.0309
Service Email: service@williamstrial.com

**ATTORNEYS FOR PLAINTIFFS**